IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

Margaret J. B.,[1]          )    C/A No.: 1:23-cv-474-SVH
                     )
         Plaintiff,    )
                     )
    vs.                )
                     )      ORDER
Kilolo Kijakazi, Acting    )
Commissioner of Social Security  )
Administration,          )
                     )
        Defendant.   )
                     )

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable R. Bryan Harwell, Chief United States District Judge, dated February 13, 2023, referring this matter for disposition. [ECF No. 9]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 8].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB") and Supplemental Security Income

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court affirms the Commissioner's decision.

I.    Relevant Background

A.    Procedural History

On July 30, 2020, Plaintiff protectively filed applications for DIB and SSI in which she alleged her disability began on July 15, 2019. Tr. at 139, 140, 254–60. Her applications were denied initially and upon reconsideration. Tr. at 143–46, 148–51, 152–55. On July 13, 2022, Plaintiff had a hearing by telephone before Administrative Law Judge ("ALJ") Alice Jordan. Tr. at 34–79 (Hr'g Tr.). The ALJ issued an unfavorable decision on August 12, 2022, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 7–28. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on February 3, 2023. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 53 years old at the time of the hearing. Tr. at 39. She completed the tenth grade. Tr. at 41–42. Her past relevant work ("PRW") was as a cleaner, a waitress, a cafeteria counter attendant, a dayworker, a groundskeeper, a cook helper, and a salesclerk. Tr. at 64–71. She alleges she has been unable to work since July 15, 2019. Tr. at 254.

2.    Medical History

Plaintiff presented to physician assistant Johnathan McCaslan ("PA McCaslan") to establish care on August 17, 2020. Tr. at 371. She was 5'5" tall, weighed 194 pounds, and had a body mass index ("BMI") of 32.38 kg/m.[2] *Id.* She reported she smoked cigarettes daily and endorsed knee pain she rated as a six on a 10-point scale. *Id.* PA McCaslan recorded normal findings on physical exam. *Id.* He assessed multiple joint pain and bronchial breathing and indicated Plaintiff required screenings for breast cancer, hepatitis C, vitamin deficiency, diabetes, thyroid disorder, human immunodeficiency virus ("HIV"), and lipid disorders. Tr. at 372. An acute hepatitis panel was positive for hepatitis C virus and lab studies indicated vitamin D deficiency. Tr. at 382, 384.

On September 8, 2020, Plaintiff reported she had fallen twice since her last visit and had injured her left wrist. Tr. at 368. She endorsed occasional

wheezing and chronic joint pain on a review of systems. *Id.* She rated back pain as a four on a 10-point scale. Tr. at 369. PA McCaslan observed full range of motion ("ROM") of Plaintiff's hand and wrist and tenderness to palpation of the distal ulna. *Id.* He noted no additional abnormalities. *Id.* He assessed hepatitis C, left wrist pain, and bronchial breathing, ordered lab studies, pulmonary function tests, and left wrist x-rays, and referred Plaintiff to Joshua Brady Holmes, M.D. ("Dr. Holmes"). *Id.*

On September 24, 2020, Plaintiff presented to Dr. Holmes to establish treatment for hepatitis C. Tr. at 366. Dr. Holmes recorded normal findings on physical exam. Tr. at 366–67. He ordered lab work and prescribed an eight-week course of Mavyret. Tr. at 367.

Plaintiff complained of increased anxiety, difficulty sleeping at night, and constipation on October 8, 2020. Tr. at 364. She denied having picked up the medications prescribed during the prior visit from the pharmacy and said she had not increased her fiber intake. *Id.* She indicated she continued to smoke cigarettes. Tr. at 365. A review of systems was positive for sleep disturbance and nervousness/anxiety, but Plaintiff denied other complaints. Tr. at 364. PA McCaslan recorded normal findings on physical exam. Tr. at 365. He prescribed Celexa for anxiety and referred Plaintiff for a mammogram and colon cancer screening. Tr. at 366.

Plaintiff complained of a cough and indicated Celexa was not working on November 3, 2020. Tr. at 429–30. PA McCaslan noted wheezing and a foreign body in the right ear canal, but otherwise normal exam findings. Tr. at 430. He assessed bronchitis, anxiety, and foreign body sensation in right ear canal, irrigated the right ear canal, prescribed Albuterol, steroids, and antibiotics for bronchitis, and added Buspar for anxiety. Tr. at 431.

On November 23, 2020, Plaintiff reported Celexa was failing to effectively treat her anxiety. Tr. at 427. She also complained of tinnitus and left wrist pain. Tr. at 427–28. PA McCaslan observed swelling, tenderness, bony tenderness, and decreased ROM of Plaintiff's left wrist, but no snuff box tenderness or crepitus. Tr. at 428. He discontinued Celexa, prescribed Effexor, and ordered x-rays of Plaintiff's left wrist and hand. Tr. at 429. The x-rays showed mild degenerative arthrosis of the thumb carpometacarpal and triscaphe articulation. Tr. at 476–79.

Plaintiff presented to Dr. Holmes with questions on December 3, 2020, after having received a shipment of Mavyret. Tr. at 426. Dr. Holmes recorded normal findings on physical exam. *Id.* He discussed with Plaintiff how to take Mavyret and its possible side effects and instructed her to follow up in four weeks. Tr. at 427.

Plaintiff reported her anxiety was stable on Effexor and endorsed left wrist pain she rated as a six on December 7, 2020. Tr. at 424. PA McCaslan

discussed results of x-rays of Plaintiff's wrist and hand, and Plaintiff indicated she would attempt to obtain a sponsorship to follow up with an orthopedist. *Id.* PA McCaslan recorded normal findings on physical exam and continued Plaintiff's medications. Tr. at 424–25.

On December 31, 2020, Plaintiff reported mild nausea and feeling tired on Mavyret. Tr. at 422. Dr. Holmes noted Plaintiff had completed all but one day of the first month of Mavyret treatment. *Id.* He recorded normal findings on physical exam. Tr. at 422–23. He instructed Plaintiff to continue Mavyrit for one more month and advised her to take it with a nighttime meal to reduce nausea and tiredness. Tr. at 423.

Plaintiff complained of worsening wrist pain on January 7, 2021, but indicated a wrist brace was very helpful. Tr. at 420. She reported taking Buspar as prescribed and indicated Effexor as working, but likely needed to be increased because she was still experiencing anxiety. *Id.* PA McCaslan recorded normal findings on physical exam. Tr. at 421. He increased Effexor to 200 mg three times a day and advised Plaintiff to keep her left wrist in the splint. Tr. at 422.

Plaintiff presented to Richard Oster, D.O. ("Dr. Oster"), for a consultative exam on January 16, 2021. Tr. at 404–09. She described chronic and near-constant pain in her knees, elbows, shoulders, wrists, and feet that waxed and waned and occasional pain in her low back that was exacerbated

6

by standing, lifting, and bending. Tr. at 404. She also complained of an intermittent burning sensation on the bottoms of her feet that increased with weightbearing and standing. *Id.* She endorsed abilities to feed herself, perform daily hygiene, dress herself, walk on level ground for 30 minutes, sit for 10 minutes, lift eight pounds using two hands, drive a car for three miles, do laundry, sweep, mop, vacuum, cook, do dishes, occasionally shop, and navigate steps, although she said she performed chores in a limited fashion and sometimes required assistance to put on her socks. *Id.* Plaintiff admitted she smoked about a pack of cigarettes a day, occasionally used alcohol, and continued to use marijuana. Tr. at 405.

Dr. Oster noted Plaintiff was 66 inches tall and weighed 191 pounds. *Id.* He observed Plaintiff to ambulate normally and without an assistive device, to demonstrate lumbar flexion to 80/90 degrees and lumbar extension to 20/25 degrees with a complaint of back discomfort, to have normal ROM of the knees with a solitary bilateral click, to show 5/5 strength in the hands with intact fine and gross manipulation, to perform a squat to 50%, to have 5/5 lower extremity strength, and to perform tandem, heel, and toe walk without difficulty. Tr. at 405–06, 408–09. He otherwise indicated normal findings. *See id.* He wrote: "Per her description, only she would have mild limitation with bending, lifting, carrying, or prolonged sitting." Tr. at 406. He stated Plaintiff had "minimally restricted range of motion due to pain

response" during the exam and "would be affected in a mild fashion with regard to heavy lifting or bending per her description." *Id.* He noted Plaintiff was undergoing treatment for hepatitis C, but did not endorse any associated limiting factors. Tr. at 407.

On February 19, 2021, state agency medical consultant Donna Stroud, M.D. ("Dr. Stroud"), reviewed the evidence, found hepatitis C to be Plaintiff's only medically-determinable physical impairment, and concluded her impairment was non-severe. Tr. at 86, 97.

On March 5, 2021, Plaintiff complained of feeling extremely tired and increased anxiety associated with a rash on her hands, upper and lower extremities, and neck. Tr. at 418. PA McCaslan recorded normal findings on exam. Tr. at 419. He prescribed Atarax for anxiety and itching and indicated he would refer Plaintiff to orthopedics at the next visit if she was approved for a sponsorship. Tr. at 420.

Plaintiff complained of bilateral wrist pain on April 20, 2021. Tr. at 416. She indicated her application for sponsorship through the hospital had been approved and requested a referral to an orthopedist. *Id.* She described pain up to her right elbow at times. Tr. at 417. PA McCaslan noted positive Tinel's and Phalen's tests and otherwise normal findings on physical exam. *Id.* He continued Plaintiff's medications, added Atarax for insomnia, and referred her to an orthopedist for carpal tunnel syndrome ("CTS"). Tr. at 418.

On June 24, 2021, Plaintiff reported no improvement in her insomnia and endorsed worsened wrist pain she rated as a nine. Tr. at 414. She indicated she had received a sponsorship, but had not been contacted by the orthopedist's office to schedule an evaluation. *Id.* PA McCaslan recorded normal findings on physical exam. Tr. at 415. He prescribed Gabapentin to help with pain. Tr. at 416.

Plaintiff presented to orthopedic surgeon Wesley Parker, M.D. ("Dr. Parker"), for evaluation of right wrist pain on August 2, 2021. Tr. at 484. She described ulnar-sided right wrist pain just proximal to the wrist and endorsed some symptoms in her left wrist, as well. *Id.* She complained of pain in her left shoulder and bilateral knees and indicated she had not undergone workup for inflammatory diseases. *Id.* Dr. Parker noted the following positive findings in the right wrist: mild swelling to just proximal to the head of the ulna; tenderness to palpation; discomfort with terminal extension and flexion of the wrist; pain with ulnar and radial deviation; abilities to make composite fist without difficulty and fully extend digits; equal and intact sensation over all digits; Heberden's nodes over the distal interphalangeal joints; fingers warm and well-perfused; and 2+ radial pulses. *Id.* He reviewed x-rays that showed degenerative changes and cystic changes to the scaphoid. *Id.* He assessed degenerative arthritis of multiple joints of the hand and discussed treatment options that included continued immobilization, anti-inflammatory

9

medications, and injections. Tr. at 484. Plaintiff opted to proceed with injections, and Dr. Parker administered them during the visit and instructed her to return in six weeks if her symptoms failed to improve. *Id.*

Dr. Corlette reviewed the evidence on August 6, 2021, and considered other and unspecified arthropathies to be a severe impairment. Tr. at 111, 128. He assessed Plaintiff's residual functional capacity ("RFC") as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; frequently push and pull with the upper extremities; occasionally climb ladders, ropes, or scaffolds; and frequently climb ramps or stairs, balance, stoop, kneel, crouch, and crawl. Tr. at 115–17.

Plaintiff presented to Stanley G. Walsh, M.D. ("Dr. Walsh"), for an initial visit on February 1, 2022. Tr. at 510. She reported increased anxiety as characterized by excessive worry, irritability, nervous/anxious behavior, and panic two to three times a day, but denied decreased concentration and depressed mood. *Id.* She complained of pain and stiffness in her bilateral shoulders, elbows, and wrists that was aggravated by lifting and activity. *Id.* Dr. Walsh recorded normal findings on physical exam, aside from tenderness to Plaintiff's bilateral wrists and shoulders. Tr. at 510–12. He prescribed Cymbalta to address Plaintiff's joint pain and anxiety and instructed her to

titrate her dose from 30 mg to 60 mg after 14 days. Tr. at 512. He prescribed Naproxen 550 mg for joint pain and ordered lab studies to evaluate for an autoimmune process or acute spondyloarthropathy. Tr. at 512–13.

On February 15, 2022, Plaintiff reported increased anxiety and worsening arthritis. Tr. at 505. She rated her pain as a six. *Id.* Dr. Walsh recorded normal findings on physical exam. Tr. at 506–07. He instructed Plaintiff to continue Cymbalta 60 mg as previously directed and indicated he would refer her to rheumatology, as a lab workup showed positive rheumatoid factor. Tr. at 508.

Plaintiff complained of worsening joint and back pain on March 21, 2022. Tr. at 502. She described worsening low back pain over the prior week that radiated to the bilateral thighs and was associated with numbness. *Id.* She rated pain in her bilateral fingers and hands as a five and indicated it was associated with numbness and loss of grip strength and caused her to wake during the night. *Id.* She noted an uncontrollable urge to move her legs at night that was associated with pain and improved by massage and movement. *Id.* Dr. Walsh noted rapid pulse, obesity, bilateral wrist tenderness, positive bilateral Phalen's and Tinel's signs, positive bilateral straight-leg raise ("SLR"), lumbar tenderness and spasms, bony tenderness at the lumbar spinous processes, normal ROM of the bilateral wrists, no swelling, deformity, effusion, bony tenderness, or crepitus of the wrists, no

swelling or deformity of the lumbar or thoracic spine, normal ROM of the lumbar and thoracic spines, and pain greater with flexion than extension of the lumbar spine. Tr. at 502–03. He observed Plaintiff to demonstrate normal gait and to have no sensory or reflex deficits. Tr. at 503. He assessed chronic bilateral low back pain and sciatica, bilateral CTS, restless leg syndrome ("RLS"), and anxiety. Tr. at 503–04. He noted x-rays revealed no acute fracture or dislocation and moderate-to-severe degenerative change worst at L4–5 and L5–S1. Tr. at 503. He prescribed a Medrol Dosepak for back pain and CTS, low-dose Requip for RLS, and low-dose Atarax for anxiety, encouraged Plaintiff to perform exercises for her back and to continue bilateral hand bracing, referred her to hand surgery, and indicated he would consider advanced imaging and a specialty referral if her back symptoms failed to improve. Tr. at 503–04.

Plaintiff followed up with Dr. Walsh on April 18, 2022. Tr. at 606. She described constant aching pain in her lumbar spine that radiated to her bilateral thighs and was associated with numbness. *Id.* She rated pain in her bilateral fingers and hands as a five and indicated it was achy, associated with numbness, and woke her during the night. *Id.* She endorsed anxiety and poor sleep. *Id.* Dr. Walsh noted Plaintiff was obese and had tenderness in her bilateral wrists, spasms in her lumbar spine, tenderness at the bilateral paraspinal musculature, bony tenderness at the spinous processes, positive

bilateral SLR, positive Phalen's and Tinel's signs, and pain greater with lumbar flexion than extension. Tr. at 607–09. He indicated Plaintiff's bilateral CTS was stable and encouraged her to continue to exercise and follow up with hand surgery as directed. Tr. at 609. He planned to refer Plaintiff to Spine Center for further evaluation and treatment, given her failure to improve with conservative treatment. *Id.* He increased Cymbalta to 60 mg twice a day to address Plaintiff's persistent musculoskeletal pain and anxiety and prescribed Gabapentin 300 mg three times a day. *Id.*

Plaintiff presented to orthopedic surgeon Mark Oliver, M.D. ("Dr. Oliver"), for evaluation of bilateral hand numbness and pain on May 6, 2022. Tr. at 620. She said she had difficulty gripping and holding onto objects. *Id.* Dr. Oliver noted on bilateral wrist exam: no deformity, atrophy, or skin lesions; positive tenderness to palpation at the radial styloid, first extensor compartment, volar wrist, dorsal wrist, ulnar head, and triangular fibrocartilage complex; elbow extension to zero degrees; elbow flexion to 140 degrees; normal wrist flexion and extension; no pain with ROM; no crepitus; negative Tinel's/Durkin's signs at cubital tunnel; positive Tinel's/Phalen's signs at carpal tunnel; positive Finkelstein's test; positive first carpometacarpal grind test; intact anterior osseous nerve, posterior interosseous, and ulnar motor function; decreased sensation to light touch in the median distribution; brisk capillary refills; and 2+ radial pulses. Tr. at

623–24. He stated Plaintiff's physical exam was "generally positive, which [was] likely attributable to her underlying rheumatoid arthritis." Tr. at 624. He felt medical management of underlying rheumatoid arthritis was likely to improve Plaintiff's symptoms, although she still demonstrated symptoms of CTS. *Id.* He referred Plaintiff for electromyography and nerve conduction studies ("NCS") and instructed her to follow up thereafter. *Id.*

Plaintiff presented to John Mathew Gowans, M.D. ("Dr. Gowans"), for lower back and bilateral leg pain on May 31, 2022. Tr. at 628. She rated her pain as a seven to eight. *Id.* Dr. Gowans noted normal curvature of the lumbar spine, no acute swelling, lumbar flexion and extension limited by pain, negative bilateral SLR, positive bilateral facet loading, normal lower extremity strength and sensation, and equal and symmetric reflexes at the bilateral knees and ankles. Tr. at 630. He reviewed x-rays that showed disc space narrowing and vacuum phenomena indicative of degenerative disc disease at L4–5 and L5–S1. *Id.* He noted at the L4–5 level, gas extended posterior to the disc space along the posterior margin of the L4 vertebral body, creating a presumption of herniation. *Id.* He further indicated there was facet arthropathy at L4–5 and L5–S1. Tr. at 631. He assessed chronic bilateral back pain with bilateral sciatica, ordered an MRI of the lumbar spine and flexion and extension x-rays, and prescribed Cataflam 50 mg and Zanaflex 4 mg. *Id.*

On June 14, 2022, an MRI of Plaintiff's lumbar spine showed multilevel and multifactorial degenerative changes of the spine with varying degrees of foraminal narrowing, including a broad-based disc protrusion and moderate facet arthropathy, causing mild left neuroforaminal narrowing, moderate right neuroforaminal narrowing, and right lateral recess stenosis at L4–5, and a broad-based disc protrusion and moderate facet arthropathy, causing moderate bilateral neuroforaminal narrowing at L5–S1. Tr. at 642.

Plaintiff rated her pain as an eight on June 24, 2022, and indicated Lyrica and Naproxen were providing some relief. Tr. at 647. Dr. Gowans observed ROM limited by pain in flexion and extension, negative SLR, normal and non-antalgic gait, upright posture, normal lower extremity strength, and no swelling, erythema, rashes, ecchymosis, or skin lesions. Tr. at 649. He planned to schedule Plaintiff for bilateral L5–S1 epidural injections using a transforaminal approach with fluoroscopic guidance. Tr. at 651–52. He noted Flexeril and Zanaflex had provided little help, and he planned to continue Plaintiff on Naproxen and Lyrica. Tr. at 652.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

Plaintiff testified she was 5'7" tall, weighed 203 pounds, and was right-handed. Tr. at 39–40. She said she lived with her boyfriend and his mother,

15

who paid for her expenses. Tr. at 40. She stated she had insurance through the Affordable Care Act and received food stamps. *Id.* She denied having received unemployment or workers' compensation benefits. *Id.*

Plaintiff said she had last worked as a janitor for Meadow Services in July 2019. Tr. at 42. She indicated she worked for the company for three years as a school janitor, lifting up to 50 pounds. Tr. at 43, 48. She explained she had previously worked for two years as a server at Waffle House, lifting up to 50 pounds. Tr. at 43–44. She stated she had worked for two years as a hot bar server at a supermarket. Tr. at 44–45. She said worked "odd jobs" such as mowing grass and cleaning houses for cash in 2009, 2010, 2011, and 2016. Tr. at 45–46, 47. She indicated she worked for three years as a cook and server in the cafeteria at Lawrence County School, where she was required to lift 50 pounds. Tr. at 46. She stated she worked as a cashier at Dollar General for three years, lifting 20 to 50 pounds. Tr. at 46–47.

Plaintiff testified she read adventure books, watched television, and listened to music. Tr. at 49. She said she sometimes visited with family and friends. *Id.* She stated she sometimes assisted with cooking, laundry, dishes, vacuuming, mopping, sweeping, dusting, and other household chores, although she would rest after doing a little bit. Tr. at 50. She indicated she would visit the grocery store with others, but denied going on her own. *Id.* She said she sometimes helped her boyfriend's mother plant flowers. Tr. at

16

50–51. She noted she had a driver's permit, but denied having a license, as she had never owned a vehicle. Tr. at 51. She stated she performed stretching exercises to help her pain and did a little walking. *Id.* She said she had to rest after walking for five minutes. Tr. at 52. She indicated she cared for her own hygiene. *Id.* She admitted she smoked about 10 cigarettes per day. *Id.* She denied drinking alcohol and said she had last used street drugs three years prior. *Id.*

Plaintiff stated problems with her hands and legs prevented her from working. Tr. at 52–53. She described constant tingling, numbness, aching, and pain in her hands and said she had difficulty holding and was constantly dropping things. Tr. at 53. She noted she was supposed to be referred for NCS, but her doctor's staff had not made the appointment. Tr. at 53–54. She said her legs tingled and ached from her hips to her toes and she felt burning on the bottoms of her feet. Tr. at 54. She indicated this had been ongoing for two years. *Id.* She said her doctor had prescribed medication for RLS. *Id.* She noted she had been taken off Gabapentin and prescribed Lyrica, but it was no more effective. *Id.*

Plaintiff testified her arms and shoulders hurt and were achy and she had difficulty reaching. *Id.* She stated her doctor had prescribed Naproxen. Tr. at 55. She initially denied having any other physical conditions that affected her ability to work, but subsequently noted some of her problems

"might be [coming] from [her] back." *Id.* She stated her doctor had informed her something was pressing on her nerves. *Id.* She said she was scheduled to visit the neurosurgeon the following day for injections. Tr. at 55–56. She endorsed daily pain in her lower back that radiated down both of her legs. Tr. at 56.

Plaintiff confirmed that she had initially stopped working due to hand pain. Tr. at 57. She indicated Dr. Walsh informed her that her lab studies showed a positive rheumatoid factor, diagnosed her with rheumatoid arthritis, and referred her to a rheumatologist for a visit scheduled later in the month. *Id.* She confirmed she had recently been examined by Dr. Oliver, an orthopedist, who diagnosed bilateral CTS and rheumatoid arthritis affecting her hands. Tr. at 58. She stated her hand pain increased with use and she could only use her hands for about five minutes. Tr. at 58–59. She said she had difficulty reaching in all directions due to shoulder pain and could only reach for two to three minutes. Tr. at 59. She indicated she could only be on her feet for five minutes at a time. Tr. at 60. She estimated she could sit for an hour. *Id.* She stated she could only carry about five pounds due to problems with her hands and arms. *Id.*

Plaintiff testified she felt most comfortable sitting in a recliner, where she spent about 50% of the day. Tr. at 60–61. She said she sometimes used Tylenol for pain in addition to Naproxen and Lyrica and occasionally used a

muscle rub. Tr. at 61. She indicated she continued to take Duloxetine and Buspirone, but was uncertain for what they had been prescribed. *Id.* She confirmed she had been diagnosed with anxiety and depression after her attorney reminded her that Duloxetine and Buspirone had been prescribed for those impairments. Tr. at 62. She stated she sometimes felt irritable, angry, and depressed. *Id.* She indicated she had difficulty sleeping due to leg pain. *Id.* She said she slept in her recliner for an hour to an hour-and-a-half once or twice a day. Tr. at 62–63. She denied requiring daily assistance with personal care, bathing, and dressing, but noted she sometimes required her boyfriend's help to dress due to difficulty bending over. Tr. at 63.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Brenda Dumas reviewed the record and testified at the hearing. Tr. at 64–78. The VE categorized Plaintiff's PRW as a cleaner, *Dictionary of Occupational Titles* ("*DOT*") No. 381.687-018, requiring medium exertion and a specific vocational preparation ("SVP") of 2; a waitress, *DOT* No. 311.477-030, requiring light exertion per the *DOT* and medium exertion as performed and an SVP of 3; a cafeteria counter attendant, *DOT* No. 311.677-014, requiring light exertion and an SVP of 3; a dayworker, *DOT* No. 301.687-014, requiring medium exertion and an SVP of 2; a groundskeeper, *DOT* No. 406.684-014, requiring medium exertion and an SVP of 3; a cook helper, *DOT* No. 317.687-010, requiring medium exertion

and an SVP of 2; and a salesclerk, *DOT* No. 290.477-014, requiring light exertion and an SVP of 3. Tr. at 64–71. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work requiring frequent pushing and pulling, occasional climbing of ladders, and frequent climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling. Tr. at 72. The VE testified the hypothetical individual would be able to perform Plaintiff's PRW as a cafeteria counter clerk and a salesclerk as actually performed and as a waitress as generally performed. *Id.* The ALJ asked if there were any conflicts between the VE's responses and the *DOT*. *Id.* The VE stated there were no conflicts, but clarified that she had based her testimony as to climbing on her professional experience because the *DOT* did not differentiate between climbing of stairs and ladders. Tr. at 73.

Plaintiff's attorney asked the VE to consider that the individual would only be able to engage in occasional reaching. *Id.* He asked if the additional restriction would change the VE's response. *Id.* The VE stated it would eliminate Plaintiff's PRW. *Id.*

Plaintiff's attorney asked the VE to separately assume the individual would be limited to occasional handling and fingering. *Id.* The VE stated this restriction would also eliminate Plaintiff's PRW. *Id.*

Plaintiff's attorney asked the VE to consider that the individual would be limited to standing and walking for a combination of four of eight hours. *Id.* The VE said the restriction would eliminate Plaintiff's PRW. *Id.*

Plaintiff's attorney asked the VE to consider that the individual would either be off-task for 15% or more of an average workday or absent two or more days per month. *Id.* He asked if either condition would preclude work. Tr. at 74. The VE confirmed that they would be work-preclusive. *Id.*

The ALJ asked the VE to reconsider the first hypothetical question and to indicate whether there were other jobs in the economy that the individual could perform. *Id.* The VE testified the individual would be able to perform light jobs with an SVP of 2 as an usher, *DOT* No. 344.677-014, a small products assembler, *DOT* No. 706.684-022, and a sales attendant, *DOT* No. 299.677-010, with 30,000, 100,000, and 500,000 positions in the national economy, respectively. Tr. at 75–76.

The ALJ asked if any of those jobs would remain with the additional restrictions Plaintiff's counsel indicated. Tr. at 76. The VE stated an individual could perform work as an usher if limited to occasional reaching, handling, and fingering. *Id.*

Plaintiff's attorney asked the VE to consider that the individual would be limited to less than occasional handling, fingering, and reaching. Tr. at 77. The VE testified the restriction would preclude full-time work. *Id.*

Plaintiff's attorney asked the VE to consider that the individual would be limited to occasional handling, fingering, and reaching. *Id.* The VE testified the individual would be able to perform sedentary work with an SVP of 2 as a surveillance system monitor, *DOT* No. 379.367-010, and a call-out operator, *DOT* No. 237.367-014, each with 10,000 positions in the national economy. Tr. at 77–78.

2.    The ALJ's Findings

In her decision dated August 12, 2022, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2022.
2.    The claimant has not engaged in substantial gainful activity since July 15, 2019, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3.    The claimant has the following severe impairments: degenerative disc disease and degenerative joint disease (20 CFR 404.1520(c) and 416.920(c)).
4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she can frequently push and pull; occasionally climb ladders; and frequently climb ramps or stairs, balance, stoop, kneel, crouch, and crawl.
6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).
7.    The claimant was born on July 13, 1969 and was 50 years old, which is defined as an individual closely approaching advanced

22

age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has a limited education (20 CFR 404.1564 and 404.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 15, 2019, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 12–22.

## II.  Discussion

Plaintiff alleges the Commissioner erred because the ALJ did not account for her severe impairments in the RFC assessment.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

### A.  Legal Framework

#### 1.  The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4)

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform

---

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v.*

*Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

Plaintiff argues the ALJ erred in failing to include restrictions in addition to those assessed by Dr. Corlette in the RFC assessment because she considered degenerative disc disease and degenerative joint disease severe impairments, whereas Dr. Corlette did not consider them to be medically-determinable impairments. [ECF No. 13 at 3, 7–8]. She maintains the ALJ found Dr. Corlette's opinion persuasive and adopted his opined limitations without including any additional functional limitations or explaining why she was declining to do so. *Id.* at 7–8. She claims objective evidence following Dr.

27

Corlette's review shows abnormalities that support additional restrictions. *Id.* at 9–10. She concedes the ALJ "discussed some of these findings" when summarizing her medical records, but declined to address them in evaluating the persuasiveness of Dr. Corlette's opinion. *Id.* at 10–11; ECF No. 15 at 1–2. She asserts that if the ALJ had limited her to work at the sedentary exertional level, Medical-Vocational Rule 201.10 would have dictated a finding that she was disabled, given her age, education, and PRW. *Id.* at 11; ECF No. 15 at 2.

The Commissioner argues the ALJ reasonably concluded Plaintiff could perform light work with the additional restrictions. [ECF No. 14 at 5–6]. She maintains the ALJ considered the persuasiveness of Dr. Corlette's opinion based on its supportability and consistency in accordance with the applicable regulations. *Id.* at 9–10. She asserts the ALJ considered the record as a whole in assessing Plaintiff's RFC. *Id.* at 10–11.

A claimant's RFC represents the most she can still do, despite limitations imposed by her impairments and symptoms. 20 C.F.R. §§ 404.1545(a), 416.945(a). It must consider all the claimant's medically-determinable impairments and be based on all the relevant evidence in the record. 20 C.F.R. §§ 404.1545(b), 416.945(b); SSR 96-8p, 1996 WL 374184, at *2. Such relevant evidence includes, but is not limited to: the claimant's medical history; medical signs and laboratory findings; the effects of

treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports of daily activities; lay evidence; recorded observations; medical source statements; and effects of symptoms, including pain, that are reasonably attributed to a medically-determinable impairment. SSR 96-8p, 1996 WL 374184, at *5.

ALJs are specifically required to address medical source opinions in assessing claimants' RFCs. *Id.* at *7. The applicable regulations require ALJs to evaluate the persuasiveness of each medical opinion of record based on (1) supportability, (2) consistency. (3) relationship with the claimant, (4) specialization, and (5) other factors that tend to support or contradict a medical opinion, and to articulate their consideration of the opinion's supportability in the medical source's record and its consistency with the other evidence of record in their decisions. 20 C.F.R. §§ 404.1520c, 416.920c.

The ALJ must include a narrative discussion explaining the restrictions she included in the RFC assessment that applies the pertinent legal requirements to the record evidence, references specific medical facts, such as medical signs and laboratory evidence, and non-medical evidence, including daily activities and observations, and "explains how any material inconsistencies or ambiguities in the case record were considered and resolved." SSR 96-8p, 1996 WL 374184, at *7; *Radford v. Colvin*, 734 F.3d

288, 295 (4th Cir. 2013) (citing *Hines v. Bowen*, 872 F.2d 56, 59 (4th Cir. 1989)). "[R]emand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015).

The ALJ's RFC assessment mirrors that of Dr. Corlette, as she assessed an RFC for "light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that [Plaintiff] can frequently push and pull; occasionally climb ladders; and frequently  climb ramps or stairs, balance, stoop, kneel, crouch, and crawl," and Dr. Corlette assessed Plaintiff's RFC as one for lifting and carrying 20 pounds occasionally and 10 pounds frequently, standing and walking for six of eight hours, sitting for six of eight hours, frequently pushing and pulling with the upper extremities, occasionally climbing ladders, ropes, or scaffolds, and frequently climbing ramps or stairs, balancing, stooping, kneeling, crouching, and crawling. *Compare* Tr. at 16, *with* Tr. at 115–17.

Dr. Corlette based his opinion on a finding that Plaintiff had a severe impairment of "other and unspecified arthropathies," whereas the ALJ based her RFC assessment on additional medical records and imaging that supported the existence of severe impairments of degenerative disc disease

and degenerative joint disease. *Compare* Tr. at 13, *with* Tr. at 111. The undersigned considers their differing conclusions regarding Plaintiff's severe impairments to be inconsequential, as both considered Plaintiff's allegations of joint and muscle pain and objective evidence pertaining to musculoskeletal and other findings in forming their opinions. *See* Tr. at 117.

The ALJ addressed Dr. Corlette's opinion as follows:

> The undersigned finds the opinion of State Agency medical consultant Adrian Corlette, M.D., persuasive. Dr. Corlette opined that the claimant is capable of light work with frequent pushing and pulling with the upper extremities as well as frequent postural maneuvers except that the claimant is limited to occasional climbing of ladders (5A). This opinion is supported by a review of the record, including the imaging showing wrist osteoarthritis and the consultative examination where the claimant had little decrease in lumbar spine motion with lumbar flexion to 80 degrees and maintained normal ambulation, strength, sensation, and reflexes (see 5A/13). This opinion is generally consistent with the record as a whole, including the finding of intact gross manipulation at the consultative examination (3F); the lack of any musculoskeletal surgery during the period at issue; the claimant's acknowledgment of doing such things as cooking, driving, the laundry, vacuuming, the dishes, and caring for plants (3F; Hearing Testimony); and the treatment notes revealing a normal gait, upright posture, good musculoskeletal motion, no sensory deficits, no focal deficits, and no abnormal muscle tone (see 2F/6–9; 4F/7, 14; 7F/12, 16–17; 17F/3).

Tr. at 19.

The ALJ's evaluation of Dr. Corlette's opinion reflects her consideration of the supportability and consistency factors in accordance with 20 C.F.R. § 404.1520c and 416.920c, as she articulated and explained findings as to each.

In discussing the supportability factor, the ALJ referenced page 13 of exhibit 5A in which Dr. Corlette cited imaging reports and the consultative exam findings he relied on in forming his conclusion. *See id.* (referencing 5A/13 (corresponding to Tr. at 117)). She indicated she had evaluated the consistency factor based on evidence prior to and following Dr. Corlette's opinion, including the consultative exam findings, "the lack of musculoskeletal surgery" during the relevant period, activities Plaintiff reported to the consultative examiner and in her hearing testimony, and various treatment notes of record reflecting "a normal gait, upright posture, good musculoskeletal motion, no sensory deficits, no focal deficits, and no abnormal muscle tone." *Id.*

Although the ALJ's RFC assessment mirrors that of Dr. Corlette, her narrative discussion indicates her RFC assessment was based on much more than Dr. Corlette's opinion. She specifically articulated her reasons for rejecting additional alleged functional limitations.

The ALJ indicated an absence of "imaging revealing degenerative changes outside the lumbar spine and bilateral wrists . . . d[id] not suggest problems with reaching to the extent alleged." *Id.* She noted Plaintiff had not participated in physical therapy or undergone musculoskeletal surgery. *Id.* She referenced Plaintiff's reported abilities to cook, vacuum, drive, do

laundry, do dishes, and care for plants. *Id.* She cited Plaintiff's "intact manipulation skills" during the consultative exam. *Id.*

The ALJ declined to include additional restrictions as to standing, walking, and sitting, noting she "did not display any regular problems with sitting upon examination, with the claimant appearing to be in no distress and maintain an upright posture (7F/12; 17F/3)" on February 15, 2022, and June 24, 2022. *Id.* (referencing Tr. at 507, 649). She wrote: "She did not detail having to be in a recliner with any consistency to her medical providers, which does not support the inclusion of a sitting restriction[]. The claimant also displayed a normal gait upon examination, which does not fully support her testimony regarding walking limitations (e.g., 3F; 7F/12; 16–17)." *Id.* (referencing Tr. at 404–10 (January 16, 2021), 507 (February 15, 2022), 511–12 (February 1, 2022)).

The ALJ rejected allegations that Plaintiff was limited by fatigue or side effects from medication. She noted: "She did not report napping during the day with any consistency to medical providers and denied having problems with fatigue as well, which does not support a finding that the claimant will need to nap during the workday (see 7F/10, 15; 14F/4)." *Id.*

The ALJ stated she had considered the longitudinal medical record in assessing Plaintiff's RFC. Tr. at 18. She summarized the findings during medical exams over the relevant period, including positive and negative

findings, and declared the overall evidence supported the RFC assessment.

Tr. at 18–19. She explained:

> Hence, in considering the record, including the available imaging and medical evidence showing such issues as positive straight leg raising at times and spine and joint tenderness, the undersigned has provided both exertional and non-exertional limitations. Still, in considering the record as a whole, including the lack of surgery for musculoskeletal complications; the lack of any regular treatment prior to August 2020; her acknowledgment of doing such things as cooking, driving, the laundry, vacuuming, the dishes, and caring for plants; and the medical evidence showing a non-antalgic gait, upright posture, good musculoskeletal motion, intact manipulative abilities, no sensory deficits, intact strength, no focal deficits, the undersigned has found that the claimant is capable of a range of light work as set forth in the above residual functional capacity.

Tr. at 19.

The ALJ considered other medical opinion evidence in addition to Dr. Corlette's opinion in assessing Plaintiff's RFC. *See* Tr. at 19–20. She found Dr. Stroud's opinion was not persuasive because subsequent evidence suggested severe impairments imposed functional limitations. *Id.* The ALJ found Dr. Oster's opinion was "somewhat persuasive," as it was supported by his consultative exam findings and somewhat consistent with the record as a whole, but was vague in that it lacked specific work restrictions in vocationally-relevant terms. Tr. at 20. However, "to the extent th[e] opinion suggested the need for greater work restrictions," pertaining to weight bearing and sitting, she rejected such restrictions as inconsistent with Dr. Corlette's opinion, "the lack of any regular problems with sitting upon

examination, and the noted records revealing normal gait, upright posture, and good musculoskeletal motion." *Id.*

For the foregoing reasons, the court finds no merit in Plaintiff's argument. Although the ALJ included the exact same restrictions in the RFC assessment that Dr. Corlette had included in his opinion, she did not rely on his opinion alone. She evaluated the opinion evidence in accordance with the applicable regulations and provided a narrative discussion that reflects her consideration of all the relevant evidence as to Plaintiff's impairments and her explanation as to how she resolved all inconsistencies and ambiguities in the record. Therefore, substantial evidence supports the ALJ's evaluation of Dr. Corlette's opinion and her RFC assessment.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether his decision is supported as a matter of fact and law. Based on the foregoing, the undersigned affirms the Commissioner's decision.

IT IS SO ORDERED.

August 29, 2023
Columbia, South Carolina

Shiva V. Hodges
United States Magistrate Judge